IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EX PARTE FREDERICK W. BAUER,
                    Petitioner,
AND                 Appellant,

VS.

U.S., DOJ, Federal Pensions,
Att. Gen., et al.,
                    Respondent(s).

No. 03-12576WGY (Habeas)

Ancillary No.'s 04-1185 (Mandamus)
    (Interloc)  04-1381 (Appeal)

Affirmed true and correct.

JUDICIAL NOTICE

MOTION FOR
FINANCIAL-ASSISTANCE OF COUNSEL
WITH
MEMORANDUM OF LAW


Petitioner/Appellant is proceeding In Forma Pauperis on the above referenced interlocutory appeal, ancillary mandamus and the full record plus de novo review of any fundamental grounds warranting relief.

On March 15, 2004 Appellant filed by depositing in the U.S. Mail a Motion for Bail, necessitated by an extensive record of usurpations within federal prison designed to obstruct his effectiveness by self-representation in the process and prosecution of fundamental claims for relief by these same vested interests involving extraordinary circumstances contrary to democratic process and the rule of law.

1) Appellant herein moves for the financial assistance necessary to his self-representation (counsel); that this financial assistance be provided by the Department of Justice and/or Federal Bureau of Prisons as they are some of the party respondent's necessitating this action over 15-years as part of their program of cover-up and denial. These respondent parties are also conspirators with others to deny me as Appellant the necessary, equal and commensurate financial and material resources to process/prosecute these grounds effectively.

2)    Second, Appellant moves for the assistance, by appointment, of specialized counsel, either standby or hybrid, in the interests of justice due to the complexity of the grounds made so by the Justice Departments influence and obstructions of the process.... supported by an extensive record over 15-years, apparently continuing. <u>EXHIBIT A</u>

**IN SUPPORT** OF AN ALREADY EXTENSIVE RECORD over 15-years continuing, this institution has apparently been perplexed with a new warden as of March, 2004 (Carol Holinka - replacing T.C. Outlaw). As stated earlier in this action and by mandamus in the First Circuit, the BOP is denying Appellant access to his legal files, financial resources, materials, time in the law library and specifically a "legal furlough" which is time away from a frivolous job assignment (made for alleged accountability purposes) to access the law library, in the event he was allowed meaningful access to his files, records, own books and financial resources, at least commensurate to the privileges provided to non-political prisoners. This is a low-security institution designed to "warehouse" non-violent and political prisoners so as to provide jobs to the local community (farm). <u>See</u> Title 28 Code of Federal Regulations, § 543.10, 543.11(a), (e), 543.11(f)(2) & (2)(i), 543.11(h)(typewriter use only allowed in the library, not at job), **543.11(i)**. As provided earlier in this action and by mandamus, this Petitioner requested a "legal furlough" to effectively deal with the Court's procedural morass and to comply with orders issued accordingly. This request was directed to Petitioner's so-called "Unit Team" as engineered by Unit Manager ... in fraud, Don Tomsche, off an extensive record, accompanied by so-called "Counselor" Mike McCauley and Ron Potts, as supported by so-called "Case Manager" Jennifer Vossen. Mine being a political case involving an extensive conspiracy of cover-up, Tomsche has to pursue the subversion of my request higher up the ladder.

Exhibit B

2-18

Associate Warden William, R. Wood, then requested a copy of the court ordered deadline(s) so that he could then deny my request.[*] This was during the transition period of the new warden's arrival. **Therefore,** on 3/10/04 I submitted an "Inmate Request" to the new Warden - Carol Holinka, asking for a "legitimate" explanation for the denial of my legal furlough. Conveniently Aw Wood in some way got ahold of my request addressed and mailed to the Warden, again denying a legitimate explanation, with every incentive to do so.[**] **Exhibit C    As one can see** the BOP's agenda is to tie me up in their rinky-dink administrative process so as to take up time necessary to deal with the merits of their own deprivations against me plus the merits of fundamental grounds before numerous federal courts over the last 15-years, continually being obstructed by dedicated federal bureaucrats in conspiracy like **Wood.** "Bauer, we're going to slow you down in your legal work." Lt. Houck, USMCFP-Springfield (1993), plus many other comments in support of their pattern of denial and cover-up, their modus  operandi, being ignored by their fellow federal bureaucrats in federal courthouses, also off an extensive record and pattern, obviously now denied to me. See 28 C.F.R. § 40.7(c)(No inmate or employee who appears to be involved in the matter shall participate in **any capacity** in the resolution of the grievance). See 28 CFR § 40.6(a meaningful remedy). See 28 CFR § 40.7(a) (Necessary materials **shall** be freely available to **all**(indigent)inmates).

---

[**] **Wood is** one of numerous defendant's, at this institution, named specifically  in a civil suit involving the deprivations of my process, destruction of my legal materials (pattern), denial of necessary resources, retaliations for the exercise of my Redress against the BOP/DOJ, obstructions of justice, acting in neglect to prevent and the obstruction of my administrative remedy process as required and mandated by the courts. Thus his motive to delay, obstruct, retaliate and cover-up. See Case No. 89-C-902-S, W.D. Wisc. & No. C 02-4258VRW, N.D. Calif., et al.

---

[*] **AW Wood is** due to retire soon and therefore knows full well that he will not be held accountable for his subversions or deprivations of my process, **except** of course via his federal pension and retirement accounts. See Exhibit E1-10 in ancillary mandamus referenced above.

## MEMORANDUM OF LAW IN SUPPORT:

Appellant was denied due process and counsel (effectively) at trial, sentencing and essentially on direct appeal; the truth be known .... and accepted, out of denial.  He herein wonders if it would be asking too much for due process and assistance from the outside so that the truth and justice may be had, pursuant to the "Great" Writ (privilege) of Habeas Corpus, Writ of Mandamus, and All Writs.  The law, for what its worth, warrants such assistance and process from financial resources being squandered by federal bureaucrats in their extensive program of denial and cover-up ongoing now for the last 15+ years.

Any doubts as to a person's eligibility for appointment of counsel under the Criminal Justice Act should be resolved in his favor.  Erroneous determinations of eligibility may be corrected at any time.  Title 18 U.S.C. § 3006A.

[Actual or [constructive denial of counsel, appointment or assistance of, altogether ... is legally presumed to result in [p]rejudice.  Strickland v. Washington, 466 U.S. 668, et al (1984).

Appellant has constitutional Rights and Privileges to the assistance from counsel, investigators, experts, etc., the Privilege of Habeas Corpus, to Redress his Grievances against the government, and Due Process and Equal Protection of the Law.  First, Fifth, Sixth Amendments, Article I, Sect. 9, Cl. 2 and Article IV, Section 2.  See Uveges v. Pennsylvania, 335 U.S. 437, et al (1955)(due process).

Subsection (c) of the Criminal Justice Act (CJA) provides that counsel should be appointed to represent a person at every stage of the proceedings from initial appearance through appeal "including ancillary matters appropriate to the proceedings."

In determining whether a matter is ancillary to the proceedings, the judicial officer should consider whether the matter, or the

4-18

issues of law or fact in the matter, are closely related to the facts
and circumstances surrounding the principal criminal charge.[*]

In determining whether representation in an ancillary matter
is appropriate to the proceedings, the judicial officer should consider
whether such representation will support one of the following objectives:

(1) to protect a Constitutional right;

(2) to contribute in some significant way to the defense of, or
to enforce a plea agreement in, the principal criminal charge;

(3) to aid in preparation for trial or **disposition** of the prin-
cipal charge;

(4) to preserve the interests of a CJA client in, or to effect-
uate the return of real or personal property pursuant to 21 U.S.C §
881, or similar statutes, which property, if recovered by the client,
may be considered for reimbursement to the CJA. See U.S. v. Martinson,
809 F.2d 1364 (9th Cir. 1987).

The reference in the CJA to requests by "[C]ounsel" for nec-
essary financial assistance clearly includes (but is not limited to)
counsel appointed under the ACT. § 3006A(e)(1)(authorizes any counsel
for a person who is financially unable to obtain investigative, expert,
or other services necessary for adequate representation ... [to] re-
quest them ...). Clearly, therefore, the Act contemplates an applica-
tion for support services by volunteer or other counsel not appointed

[*] Foley & Lardner, the largest law firm in Wisconsin, was mysteriously
appointed to represent Appellant on his direct appeal from conviction
(2nd) after a petition for writ of mandamus to the U.S. Supreme Court
to compel. The appeal process was also a massive fraud and the record
will show that attorneys for Foley & Lardner sold out their client on
behalf of their apparent political and economic litigation interests
with government entities, state and federal. The FEDS engineered an
ancillary "civil" forfeiture to use secretly in the direct appeal, off
oral arguments, so as to allow the complicit federal court to affirm.
At my direction, appointed counsel refused to address this fraud, claim-
ing that they were not appointed to represent me in the forfeiture ...
in which I was intentionally denied notice. See U.S. Supreme Court No.
90-6351(mandamus); No. 92-9014 (510 US 807); 92-7933 (507 US 1028);
92-6716 (506 US 1078); 92-5142 (506 US 882, Cert. Den.)(counsel abandonment).

*5-/8*

**not** appointed under section (e)(2). "For [investigative, expert and related] services to be meaningful in the Habeas context they ... must be available prior to the filing of the first federal habeas petition." <u>McFarland v. Scott</u>, 512 U.S. 849, 860 (1994)(O'Connor, concurring in the judgment in part). <u>Accord id</u> @ 858.

Whenever an indigent litigant's interest in the outcome of a proceeding is substantial, the due process guarantee of fundamental fairness requires a right to funds for effective prosecution. <u>See</u> Ake v. Oklahoma, 470 U.S. 68, 77 (1985), <u>citing</u> <u>Matthews v. Eldridge</u>, 424 U.S. 319 (1976)(Social Security proceedings). Appellant was facing a life sentence during his Kangaroo trial and sentencing process, which he essentially received, at the time age 45, justified by the Kangaroo Court without the assistance of counsel.*

"The private interest in the accuracy of a criminal proceeding that places an individual's life, liberty or property at risk" —— the central concern in postconviction proceedings —— is "almost uniquely compelling." <u>Matthews</u>, <u>supra</u> @ 335. To the extent that a prisoner can demonstrate that the effective assistance of counsel (self) or some type of financial assistance is necessary to test the reliability and accuracy of the guilt and sentencing determinations at trial, his "private interest" is similar to the one at stake in Ake, supra @ 79.

The governmental interest adversely affected by the appointment of counsel or the provision of essential financial assistance is

---

* Attempting to coerce a guilty plea so as to negate any challenge to their outrageous governmental conduct, the FEDS engineered an obstruction of justice prosecution while in the local County Jail (Dane) utilizing additional informants (Heffner & Teta) to claim that I wished to hire them to threaten, intimidate or harm government employees and witnesses; a fabrication to which I had no prior pre-disposition. When they realized that they could not indict, they then engineered an enhancement to my sentence under a lower standard of preponderance of the evidence and then shipped me off secretly to MCC-Chicago so as to prevent my defense preparations for sentencing, access to witnesses in the County Jail, my legal files, law books, resources. The trial judge was in on the orchestrations and deprivations as the record will show.

monetary — an interest generally held to be of secondary importance when compared to the constitutional rights enforced in postconviction proceedings. Id. (state has no legitimate interest in using its super-ior resources or financial position for "maintenance of a strategic adv-antage"); Bounds v. Smith, 430 U.S. 817, 925, et al (1980)("cost of protecting a constitutional right cannot justify its total denial"); Smith v. Bennett, 365 U.S. 708, 713 (1961)("Financial hurdles must not be permitted to condition its [the writ of habeas corpus] exercise."); Mickens v. Winston, 462 F.Supp. 910, 912 (E.D. Va. 1978), aff'd 609 F2d 508 (4th Cir. 1979).

Courts have also held that these rights to assistance extend to complex civil cases brought by indigent prisoners. Case v. Nebraska, 381 U.S. 336, 347, et al (1965)(due process may require states to have adequate postconviction remedies available to redress violations of federal constitutional rights in the criminal process); Williams v. Martin, 618 F.2d 1021 (4th Cir. 1980)(relying on the right to "effect-ive defense" as basis for ordering district court to provide habeas cor-pus petitioner with expert assistance to determine if rights were vio-lated at trial). This is especially so given that the constitutional and other bases for challenging both convictions and sentences are oft-en as difficult and sophisticated as the controlling theories in com-plex civil cases and are not so obvious that a lay person would easily recognize them. See McFarland, supra, 512 U.S. @ 855-56; Giarratano v. Murray, 668 F.Supp. 511 (ED Vir. 1986), aff'd 847 F.2d 1118, 1122 (4th Cir. 1988); Bounds v. Smith, supra @ 825 (due process right to "reasonably adequate opportunity to present claimed violations of fun-damental rights to the courts."); Wolff v. McDonnell, 418 US 539, 579, et al (1974)(No person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional

rights); Cruz v. Hauck, 475 F.2d 475, 476 (5th Cir. 1973)(prison regul-
ations may unreasonably invade prisoner's relationship to the courts).
Accord, McCarthy v. Madigan, 503 U.S. 140, 153 (1992); Lewis v. Casey,
518 U.S. 343, 356 (1996)(prison officials must devise (vs. obstruct)
suitable mechanisms to "ensure that inmates with language problems have
a reasonably adequate opportunity to file nonfrivolous legal claims
challenging their convictions or conditions of confinement"; mere
physical access to the law library is insufficient because "it is th[e]
capability [of filing suit], rather than the capability of turning pag-
es in a law library, that is the touchstone").  The extensive record
will show that especially this institution and the BOP in general goes
out of its way in political cases to covertly obstruct access to legal
resources, materials and the courts.  They have been at this "game"
for years and are thus well versed at the subversions.  EXHIBIT D1, D2
That along with their influences rightly placed, they are able to keep
the spin on justice, out of balance, forever preventing a proper address
on the merits of grounds against one of their own or the status quo.
Mine is a good example of the extent to which the government will go,
and expense, to avoid accountability ... to the death, at any hidden
cost.  How will the legitimate taxpayer ever know anyway?  Even moreso,
on a habeas petition because "a prisoner must clear a significantly
higher hurdle than would exist on direct appeal." U.S. v. Frady, 456
U.S. 152, 166, et al (1982).  See Johnson v. Zerbst, 304 U.S. 458, 468,
et al (1938)(habeas corpus lies to assure that no defendant forfeits
life, liberty or property without the basic structure of a fair trial).

    If a state fails to afford prisoners free counsel in preparing
postconviction petitions, it must permit "jailhouse" lawyers to assist
in preparing such papers. ... necessitating financial assistance.
See Bounds, supra @ 823; Younger v. Gilmore, 404 US 15 (1971), aff'd

8-18

Gilmore v. Lynch, 319 F.Supp. 105 (N.D. Calif. 1970); Johnson v. Avery, 393 U.S. 483, 487, et al (1969).

The conclusion then is that not only the procedural due process component of the Due Process Clause, the "meaningful access" component therein, the Suspension Clause and Equal Protection Clause, plus various Privileges and Immunities under Article IV, Section 2, provide strong bases for concluding that counsel is required and/or necessary financial assistance if one is proceeding without counsel or otherwise, from the confines of federal prison where they continually use alleged budget constraints (by fraud) to obstruct, restrict, coerce and ignore these Rights and Privileges and they indifferently avoid the necessary improvements and efficiencies available to improve overall operations and management of the government. See Title 5 U.S.C. § 901(a)(1),(2) & (3) and § 706(1)(2)(A),(B),(C) & (D) of Administrative Procedures Act. Counsel's assistance or financial assistance or both is necessary to assure fundamental fairness in due process for indigents in habeas corpus proceedings. La Clair v. U.S., 374 F.2d 486 (7th Cir. 1967); Schultz v. Wainwright, 701 F.2d 900 (11th Cir. 1983)(interests of justice or due process so require assistance). An additional attorney may be appointed in an extremely difficult case where the court finds it is in the interest of justice to do so. Criminal Justice Act

"A habeas corpus proceeding must not be allowed to founder in a procedural morass." Harris v. Nelson, 394 U.S. 286, 292, et al (1969) ("The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action")("The scope and flexibility of the writ——its capacity to reach all manner of illegal detention——its ability to cut through barriers of form and procedural mazes——have always been emphasized and jealously guarded by courts and lawmakers. The very nature of the writ demands that it be

9-/8

administered with the initiative and flexibility essential to insure
that miscarriages of justice within its reach are surfaced (not behind
closed doors) and corrected["forthwith"]).  Harris, supra, @ 291.

    "In reviewing the district court's decision on a petition for
habeas corpus, the Court of Appeals is not bound by findings of the
district court, but instead applies de novo standard of review."
Maldonado v. Scully, 86 F.3d 32 (2nd Cir. 1996).  Title 28 USC § 2243 WoP.

—————————

# Conclusion

Assistance from outside counsel plus financial assistance is necessary to compete with the superior resources being used by federal entities over 15+ years to usurp fundamental grounds for relief by very expensive procedural gimmicks under the fraud and sophistry of justice being served.

"When plunder ($) becomes a way of life for a group of men (and women) living together in society, they create for themselves in the course of time, a legal system that authorizes it and a moral code that glorifies it."
— Bastiat

"The Due Process Clause requires counsel for all persons charged with serious crimes." Uveges v. Penn., 335 US 437, 93 LEd2d 127, 132, 69 S. Ct. 184 (1948)

"There is, of course, strong temptation to relax rigid standards when it seems the only way to sustain convictions of evildoers." (as alleged). (Exhibit D3) Krulewitch v. United States, 336 US 440, 457, 69 S.Ct. 716, 725, 93 LEd. 790 (1949)(Jackson, J. concurring). This is especially true where the conviction is for a narcotics violation at a time when the country is engaged in a "war on drugs." (so-called)(See Exhibit B.) However, a courtroom is not the proper place in which to fight such a "war." A defendant charged with a narcotics violation is presumed like every other defendant to be innocent until proven guilty beyond a reasonable doubt after a fair trial. Cited in U.S. v. Eduardo-Franco, 885 F2d 1002, 1011 (2nd Cir. 1989) 11-18

# Necessary Relief
## (Motioned For)

1) **Appoint** specialized, professional, uncompromised standby or hybrid counsel — at least two — to assist Appellant in preparing his appeal briefs on Writ of Habeas Corpus, and ancillary matters.

2) **Appoint** specialized, professional, uncompromised counsel — at least two — to represent petitioner in the civil complaint(s) ancillary to his criminal cases. Counsel necessary to amend the original complaint(s) due to the complexity of the facts and obstructions inside Federal Prison.
Conley v. Gibson, 355 U.S. 41, 45-46 (1957)

3) **Injunction** the Department of Justice to grant Petitioner/Appellant unrestricted and unobstructed access to his legal files and materials. Meaningful access that was previously granted then removed as part of the DOJ's program of obstruction and cover-up.

4) **Injunction** the DOJ to unrestrict and unencumber Petitioner's commissary trust account so as to allow his privileges to necessary resources to prosecute his litigation adequately plus effectively assist counsel in complex issues, Law and facts. In one ancillary tax case the government listed six attorneys in representation against this lone federal prisoner, allowing them to prevail only by fraud on the process and influence (apparent) on the courts. The

DOJ has no legitimate reason — in conspiracy with federal courts — to restrict his commissary account — other than to obstruct the effective prosecution of substantial claims against various vested federal and state interests. This considering the thousands of dollars spent over 15 + years in their cover-up (denial) program versus the few pennies they expect to collect by encumbering the account.

5) Petitioner — age 59 — has been diagnosed by the BOP with Grave's Disease (hyperthyroidism). The major symptoms are shortness of breath, swollen-bulging left eye, blurred and distorted vision and overactive metabolism. The BOP's program of harassment, retaliations and obstructions aggrevate these conditions. Furthermore, in 1999 the BOP (FCI-Sandstone) trashed his specialized eye glasses and again in 2003 this institution denied him access to specialized reading glasses sent by friends from the street — returned for no legitimate reason other than to retaliate. Petitioner contacted this disease while in segregation; placement undertaken to further obstruct and retaliate. Petitioner **needs** these glasses and his own medicine — denied by the BOP, as he is unable to order from the street (specialized **health services**) given the necessary resources — job pay-to do so. Petitioner needs injunctive relief to compel same.

6) Appellant / Petitioner needs the assistance of specialized investigators, psychiatrists, and other **expert services** to develop the facts in

support of the fundamental and substantial obs-
tructions against him. The DOJ and Courts
have spent a small fortune over the years attempt-
ing to avoid accountability and prevent Petitioner
from prosecuting these claims! Most of his
complaints/petitions todate have been intent-
ionally dismissed (by fraud) for failure to prosec-
ute; acting in conspiracy with the DOJ utilizing
the confines and threats of federal prison to obstruct.

                                    Exhibit E

7) **INJUNCTION** the DOJ/BOP to deposit $100.00 (One
Hundred dollars) per month into my commissary
account necessary to prosecute my claims against
them. As with the Criminal Justice Act (See page
5(4) herein), this money from damages owed by the
BOP — to come from their pension accounts — for
their obstructions of justice (42 USC § 1985), actions
in neglect to prevent (42 USC § 1986), retaliations
(42 USC § 1997d) and back pay owed to me plus
compensation for property destroyed indifferently
over 15-years. This off extensive records (patterns).

        "An entity that chooses to indulge in-
efficiencies cannot expect to be granted
special dispensations." Texaco v. Dept.,
        60 F.3d 867, 879 (1st Cir. 1995).
        (If "[t]he mills of the bureaucrats
grind slow, then the agency, having
called the tune, must pay the piper"). U.S.
v. Meyer, 808 F.2d 912, 913 (1st Cir. 1987); See e.g.

                                        14-18

U.S. v. Baus, 834 F2d 1114, 1123 (1st Cir. 1987)(holding that the government

> ["For those who choose, and for my part I think it less evil that alleged criminals should escape than the government play an ignoble role. For those who agree with me, no distinction should be taken between the government as prosecutor and the government as judge." Olmstead v. U.S., 277 U.S. 438, 470 (1928)]

"Should not be allowed by words or inaction to lull a party into a false sense of security and then by an abrupt volte-face strip the party of its defenses"); Cutler v. Hayes, 818 F2d 879, 896 (D.C. Cir. 1987) (explaining that, when administrative agencys loiter, "the consequences of dilatoriness may be great").

8) **Injunction** The BOP to return petitioner to a job assignment in the Recreation Department (where the law library is located). He was removed from his job there in November, 2000, for no legitimate reason, his legal files were also removed, and his pay (Grade 1 was taken). Plus reimburse his back pay needed for litigation costs and accounts payable off loans over many years to cover litigation costs and expenses.

9) **Injunction** The BOP to return all his legal files and materials to the Rec. Building and again provide storage for all materials in one location therein to allow meaningful access to filing, sorting and search.

15-18

Upon arrival here at FCI-Waseca in Feb. 2000, Petitioner was given a storage closet for his legal materials, pictures were eventually taken of its remodeling (by him) and then, from apparent higher authority and in retaliation, the closet was taken away (Oct. 2000) and 60% of his materials/files confiscated, for no apparent legitimate reason, falsifying and backdating the confiscation paperwork to justify their actions and indifference (Lt. Kimball acting from higher authority). See 28 CFR § 553.10, 553.13(a)(2)(i) + 543.10 et seq.

10) Appoint a **Special Master** to assist in the adjud-ication of these complex-interwoven deprivations, as may be qualified by Petitioner, in the interests of justice to him, and thus without prejudice. Rule 53, Fed. Rules Civ. Proc.

11) **Release** Petitioner from wrongful imprisonment which will facilitate his process and effective counsel against superior resources being utilized by the gov-ernment to continually subvert (by fraud) his eff-ective prosecutions; the same subversions also used during trial, sentencing and on direct appeal, and since in all post-conviction proceedings. **Exhibit F**

12) Allow for **amendment or supplement** of this action as necessary to fill any void left by the Court's in failing to liberally construe the facts or law presented.

13) **Call** Petitioner for clarification of any facts or matters related hereto or ancillary information. (507) 835-8972

14) **Injunction** the BOP to provide necessary materials and privileges to this indigent petitioner/Appellant; privileges available to non-political prisoner/litigants and those non-politicals whose money and resources were not seized or confiscated along with their alleged crimes. e.g. typewriter ribbons, radios (plug-in) and batteries, calculator, commissary items *Exhibit* **G**, copy cards, postage stamps (without restriction) Certified-Return-receipt postage to verify delivery of mail being continually obstructed and un-verified, *Exhibit* **H**, ((intentionally off an extensive record), athletic equipment and gear, Religious materials, Educational materials, Hobby-craft materials, hygiene and health-care items, legal research and materials not provided by the BOP/DOJ as "not required," ✶ proper shoes (fallen arches and ankles), a watch, legal materials such as office supplies, pens, etc., a mirror, vitamins, typewriter print wheels, some food items (See Ex. G ✓), typing services, copy-printing services, other legal and personal materials and services available to the general prison population.

---

✶ The Minnesota State Law Library provides legal research free to state prisoners (used to be free to all prisoners in state) now they charge Federal Prisoners twenty-five cents (25¢) per page. (651)296-2775, TDD:(651)282-5382, http://www.lawlibrary.state.m.us

Dated: April 1, 2004 (April Fool's Day)

Submitted in good faith as affirmed, declared, certified true and correct under penalty of perjury with all Rights, Power, Privileges and Imm-Unities invoked and reserved and Without Prejudice.

Certification of Mailing:

C.A.

[aka "Shithead"]
See Exhibit F

Frederick W. Bauer
Frederick W. Bauer #02706-090
POBox 1731-D, FCI-Waseca
1000 University Drive S.W.
Waseca, Minnesota 56093
(507) 835-8972 Tel
837-4547 Fax

Exhibits:

A    Article - Accomplices to Perjury by Alan Dershowitz
B    Article - Our Justice System, So-Called, Judge Lay
C    AW Wood for Warden frivolous response of 3/23/04
D1   Article - Who really has "games?" by Tracie Roe
D2   Attention Inmates Notice by Bret Parks
D3   Article - Mass hysteria thriving on prosecutions
E    AOUSCts letter of March 17, 2004 - Bowden
F    Letter of May, 1990 by Nancy Polzer (cousin)
G    FCI-Waseca Commissary Sales List, 9/03
H    Letter of 3/24/04 from DOJ/OIP (coverup-denial)

# Accomplices To Perjury

### By Alan M. Dershowitz

CAMBRIDGE, Mass. As I read about the disbelief expressed by some prosecutors at the Mollen Commission's recent assertion that police perjury is "widespread" in New York City, I thought of Claude Rains's classic response, in "Casablanca," on being told there was gambling in Rick's place: "I'm shocked — shocked!"

For anyone who has practiced criminal law in the state or Federal courts, the disclosures about rampant police perjury cannot possibly come as a surprise. "Testilying" — as the police call it — has long been an open secret among prosecutors, defense lawyers and judges.

Irving Younger, a onetime New York City Criminal Court judge, described police testimony in search and seizure cases this way: "When one . . . looks at a series of cases, [it] then becomes apparent that policemen are committing perjury at least in some of them, and perhaps in nearly all of them."

Judge Younger concluded that the solution to this pervasive problem was "prosecutors' work," since the "courts can only deplore" while the prosecutors can refuse to put perjuring policemen on the witness stand and can prosecute them if they lie.

He was correct in identifying the problem and in arguing that prosecutors bore considerable responsibility for its persistence. But he let the courts off the hook too easily: the central villains in the perjury scandal are precisely judges who, for decades, have pretended to believe the tallest tales told by lying cops in the face of overwhelming evidence of pervasive perjury.

Without the complicity of judges, police perjury would be reduced considerably. Officers know that in many courtrooms they can get away with the most blatant perjury without judicial rebuke or prosecution.

I have seen trial judges pretend to believe officers whose testimony is contradicted by common sense, documentary evidence and even unambiguous tape recordings. And I have seen appellate judges close their eyes to such patently false findings of fact. Judicial acceptance of obviously false testimony sends a subtle yet powerful message of approval, if not encouragement, to perjurers.

In Boston, the police routinely made up imaginary informers to justify searches and seizures, and the judges believed them.

In a Federal case in New York, a judge credited the testimony of a policeman even though he was caught on

## Judges know when officers lie. They share the blame.

tape telling an informer that if he testified truthfully, he would run him over "with a truck" and that if the informer ever said "that I said it, I'm gonna deny it." The cop then denied saying it, and despite the tape the judge pretended to believe him.

In Nassau County, a policeman showed a key witness photographs of a suspect before the witness was asked to pick the suspect out of a lineup, and then denied under oath that he had done so.

Many trial judges were prosecutors, and they know perjury when they hear it — and they hear it often enough to be able to do something about it. Yet many tolerate it because they think most victims of police perjury are guilty of the crimes for which they stand charged.

Some judges refuse to close their eyes to perjury, but they are the rare exception to the rule of blindness, deafness and muteness that guides the vast majority of judges and prosecutors.

The Mollen Commission includes a former judge and prosecutor; unless it broadens its focus to include judges and prosecutors who subtly encourage perjury, nothing will change.

A few cops will be prosecuted, and a quarter-century from now yet another blue-ribbon commission will be "shocked — shocked" at the pervasiveness of police perjury in the criminal justice system.

*Alan M. Dershowitz is professor of law at Harvard.*



# Our Justice System, So-Called

### By Donald P. Lay

In an effort to fight crime, we aimlessly set goals of putting more and more people into jails and prisons, regardless of consequential costs or the complete denigration of dignity and resulting human sacrifice. As a nation, we countenance, without apparent concern, increasing episodes of temporary banishment of individuals to horrific and indecent environs in our jails and prisons, and falsely assume on their return to society that they will become useful citizens bearing no resentment.

The criminal justice system is a disgrace to a civilized nation that prides itself on decency and the belief in the intrinsic worth of every individual. The system is a complete failure. The financial waste incurred by communities, cities, states and the Government is unbelievable. The crimes committed against those who are victimized by the system are intolerable.

The human waste caused by the warehousing of prisoners is unconscionable. The reverberation to our society is found in an increasing crime rate, resulting from the failure of the criminal justice system to adequately rehabilitate rather than show contempt for prisoners.

Charles E. DeWitt, President Bush's nominee to head the National Institute of Justice, has observed that the nation's prison and jail population recently passed the one million mark and is rising at a 13 percent annual rate. Maintaining that rate of growth would cost at least $100 million per week for construction of new facilities alone. There were 343,569 total inmates in the jail population in 1988. Local jail occupancy rate in 1989 was 108 percent of capacity; in 1988, it was 101 percent; in 1983, it was 85 percent.

*Donald P. Lay is chief judge of the Eighth Circuit Court of Appeals. This article is adapted from an address to the National Association of Pretrial Service Agencies, in Minneapolis.*

According to the Jail Population Statistics, Bureau of Justice Statistics Survey, dated June 30, 1989, 26 percent of jails were under Federal or state court order or consent decree to limit the number of inmates. Fifty-one percent of jails sampled held prisoners because of overcrowding in other institutions. This figure was 29 percent in 1983 and 17 percent in 1983. In 1989, 395,553 persons were held in state and Federal jails. This is a 15 percent increase over 1988.

According to Bureau of Justice statistics, in 1978 there were a total of 3,693 jails in operation, but by 1988 that number had decreased to 3,316, a 5 percent reduction. From 1983 to 1988, there was a 51 percent increase in the total jail population.

The atrocities that take place within jails and prisons are common-

## It is too costly and breeds crime.

place. A few years ago, I visited a correctional institution in a southern state. A 19-year-old farm boy had just been sentenced for one year for possession of marijuana. He was received in their central processing unit, designed to hold 120 prisoners. At that time there were 465 prisoners incarcerated in small cells in a four-level building that afforded little ventilation and no recreational area.

The young man was sent to a psychological evaluation unit. After two hours they picked up his exam papers and he had written only two words: "Help Me. Help Me." Officials discovered that he had been put in a small cell block containing four beds with 11

other inmates who had sexually assaulted him for 48 hours, every hour on the hour.

A 19-year-old prisoner at the Missouri Training Center, the victim of a number of homosexual rapes, was given three alternatives by a prison official: submit, fight back or escape. He chose the last alternative. The Missouri Supreme Court affirmed his conviction for the escape charge, concluding that conditions of confinement do not justify escape and are not a defense.

The public has every right to deeply resent those who commit crime. However, the kneejerk reactions by angry executives, politically conscious legislatures and vindictive judicial officers is taking us down a primrose path with little success in combating crime.

The resulting approach is accomplishing nothing more than exorbitantly wasting tax dollars, creating a warehouse of human degradation and in the long run breeding societal resentment that causes more crime.

In the Federal system, the commitment to double the size of our prisons by 1995, to increase mandatory minimum sentences and to sentence by the crime and not by the individual is simply a corollary to this societal attitude.

There exists a crying need to develop a nationwide system of intermediate sanctions for those who are convicted of nonviolent felonies. Our penology system needs to develop work release programs, community service programs, schooling, vocational training and other forms of supervised productivity in lieu of wasteful expenditures of tax dollars and warehousing of individuals.

Punishment is one thing, but our incarceration policies are wasteful and should be changed. Present policies breed further crime, dehumanize individuals and require gross expenditures of tax dollars needed for other purposes. With our nation facing both societal and fiscal crises of unrivaled proportions, we must move quickly and forcefully to overhaul the current system.

THE NEW YORK TIMES — MONDAY OCTOBER 22, 1990

*Warehouse Receipts and the National Debt*

**RESPONSE TO INMATE REQUEST TO STAFF**
BAUER, Frederick W.
Reg. No.: 02706-090


This is in response to your Inmate Request to Staff which was received in my office on March 15, 2004 in which you request an explanation for not being granted time off for legal work in February 2004.

Attached is the copout response dated February 19, 2004 which originally addressed this issue.  If you have an additional request for time off for legal work please see your unit team.

_____          _____
C. Holinka, Warden                                          Date

*March 23, 2004*    *Rec'd 3/25/04*

*C*

# Who really has 'game'?

*BOP's*

## By Tracie Roe, former corrections' officer

For the last four months I was an employee with the Bureau of Prisons. I was at a High/Max prison in South Carolina. I worked in a housing unit with over 200 male inmates. The key word is 'was.' Over those four months I was told that an "inmate is just an inmate;" "they're crooks;" "they've all got game, be careful it's their goal to con and manipulate you." What did I find? *The inmates were the only predictable people.* The people on staff were the shock to my system. People asked me how I could work at a male prison; well, it wasn't the inmates who made it hostile.

I was never asked to do anything illegal. The most that prisoners asked for was a phone call, stamps from the unit team, gum, or directions for their family members planning a visit.

I spent a great deal of time talking to these people, reading their mail or listening to how their friends and family dropped off little by little over the years. There are many lonely, desperate men and women in our nation's prisons, all of them keeping hope for some miracle from the courts. In my four months with the Bureau of Prisons I never met one person who said they were innocent of the charges – this was a shock to me. I expected to meet hundreds of men crying 'innocent.'

The other shock was the percentage of men incarcerated for drug offenses. One in particular, a unit orderly who worked with me, has spent the last 11 years locked up for Conspiracy to Distribute and to Possess with Intent to Distribute Cocaine, Employing Persons Under Eighteen Years of Age to Distribute Controlled Substances, Using a Firearm During a Drug Trafficking Offense, and Using a Communication Facility to Commit a Drug Felony. He has Life plus 60 months with no chance of parole. I read his PSI. He was never caught with anything. He 'employed' kids who were right around his age; he was arrested one month after his 18th birthday. He did have a gun; he was never caught with drugs, and he used a cell phone (the communication facility). His REAL crime was that he didn't cooperate with the government. His punishment for that was LIFE. This man obviously had problems as a child and lived in a rough environment, but he will never have the opportunity at a second chance. Sure, he has court appeals going, but so do most inmates.

The system tried to train me to be inhumane and robotic in my dealings with the men. How did I do? I failed. I had feelings for these human beings. I empathized with their

> I was a probationary employee who already had a reputation for being an "inmate lover." What is an inmate lover? An inmate lover is anyone who defends the rights of a prisoner, anyone who talks to them with some modicum of respect, anyone who listens to them.

plight. My thought process was "wrong." My belief is that these people were put here as punishment, not to be punished. On a daily basis I saw prisoners frustrated by the lack of attention to their needs. Simple requests went ignored, requests for staff to do their jobs, i.e., process visitor requests, phone lists, obtaining addresses to the courts, assisting with inmate programming, providing counseling and release preparation and more. The best non-response I heard was "come back during open house." Guess what? Open house rarely happened. On the rare occasion it did occur, there were so many people waiting to get in, that few were seen.

I saw correctional officers intentionally damage inmate property. There were occasions where I observed officers pack property for inmates sent to the Special Housing Unit. The officers intentionally placed bottles of lotion or shampoo in the bag with the top off. There were times when soap powder was put in the bag upside-down. I observed one officer cut a lock on a locker with bolt cutters that I checked out of the control center. What was his reason for cutting the lock? It was too difficult for him to open with his key. He had gotten the locker open; he just needed to punish the inmate for having a difficult lock. He then proceeded to cut another lock that was inside the locker for good measure. What did I do during all this? I verbally protested, then shut my mouth. Why? I was a probationary employee who already had a reputation for being an "inmate lover." What is an *inmate lover*? An inmate lover is anyone who defends the rights of a prisoner, anyone who talks to them with some modicum of respect, anyone who listens to them.

These people are locked up with no real recourse. I saw legitimate administrative remedies (their recourse for injustices) being shot down. Although these remedies are addressed to the warden or to a regional office, they are sent to the department under complaint for response. How often do you think those departments find fault with their own work or actions? The responses are then sent back to the warden for his signature and blessing.

Why am I bothering to put all this in writing? Because, although I feel sentencing reform is important and worth fighting for, we must also push for the government to monitor the actions of their own. The Bureau of Prisons has policies in place. Such written statements are impressive with their talk of rehabilitation, education, counseling and security. However, it is only talk, words with little substance.

*No Accountability in Real Terms*

*P1*

# ATTENTION INMATES

The Law and Leisure Libraries will <u>NO LONGER</u> supply you with pencils, pens, paper clips, free paper, lined paper, rubberbands, etc. If you need these items, you will have to purchase them for yourself, or find another means of receiving them. PLEASE DO NOT COME AND ASK US FOR THESE ITEMS, AS THEY WILL NOT BE GIVEN OUT TO THE GENERAL POPULATION.

Thank you for your cooperation with this matter.

Bret Parks
Rec. Supervisor —

D2



For hundreds of years, hapless victims were burned at the stake as witches; *(prosecutions)* actually, the accused were doomed by a mass hysteria that thrived on persecution.

"WHEN PLUNDER BECOMES A WAY OF LIFE FOR A GROUP OF MEN LIVING TO-
GETHER IN SOCIETY, THEY CREATE FOR THEMSELVES IN THE COURSE OF
TIME, A LEGAL SYSTEM THAT AUTHORIZES IT AND A MORAL CODE THAT
GLORIFIES IT."

                                        - Bastiat -

P3

EXHIBIT



**LEONIDAS RALPH MECHAM**
Director

**CLARENCE A. LEE, JR.**
Associate Director

# ADMINISTRATIVE OFFICE OF THE
## UNITED STATES COURTS

WASHINGTON, D.C. 20544

**GARY BOWDEN**
Chief

Appellate Court
and Circuit
Administration Division

March 17, 2004    *Rec'd*
                    *3/23/04*
                    *Opened*

Frederick W. Bauer #02706-090
P.O. Box 1731
FCI - Unit D
Waseca, MN 56093

Dear Mr. Bauer:

This is in response to your letter dated February 2 inquiring about the status of your case, number 03-2617 filed in the U.S. Court of Appeals for the Eighth Circuit.

Please be advised that the Administrative Office of the United States Courts cannot provide legal guidance to you regarding any case that you had filed in the federal courts. The Administrative Office of the United States Courts has centralized responsibility for the support of federal court operations, but has no judicial authority and cannot intervene in or comment on a court's disposition of any proceeding.

Enclosed for your information is a copy of the full docket report for case number 03-2617. Judgment was entered by the Court of Appeals on November 24, 2003, as follows: the petition for writ of habeas corpus was denied; the district court's denial of the 28 U.S.C. 2241 motion was affirmed; the motion for authorization to file a successive Section 2255 motion was denied; the motion for bail was denied.

Please be advised that the Administrative Office no longer publishes a federal court directory for distribution.

If you require assistance with any legal matter, we recommend that you seek legal counsel.

Sincerely,

Gary Bowden

*E*

May 21 - 1990

My Dear Fred,

Can't wait until Sat — have so much to discuss w/ you. I am very cautious on the telephone because ~~I don't trust them~~. ~~They are capable~~ ~~of anything & every thing~~ especially after going through and bearing witness at the trial. The atrocities were appalling (understatement!) ~~Even Phil~~ ~~couldn't believe their behavior~~ towards you. He (Phil) says it is because you ~~exceed~~ exercise your ~~rights~~. When phil went to testify before the grand jury, he told me that the ~~Attorney General~~ — F.B.I agent Jerry Southworth and others referred to you as shit-head or that shit.... and always stated that you were history (MEANS?)

As you can see it always angers me every time I think of the Kangaroo Court proceedings you (allegers) went through.

FBI influence over courts = judges + clerks (the public is sleeping)

Ex F

9 Nancy

LAST NAME __Bauer__    REG.NO. __02706-090__    LAUNDRY # _____

### FCI WASECA. , MINNESOTA COMMISSARY SALES LIST  rev: 9/03
### CIRCLE ITEMS WANTED- NO ADD ONS AT WINDOW

The Commissary will be open Monday, Tuesday, Wednesday, Thursday after the 4pm count until 8:00pm. (Closed Fridays) We will hold Open House from 11:00 am till 12:30 on Thurs. for vending credits, photo tickets and questions you may have. $290.00 on the 1st (Even) or the 15th (Odd) of every month. Numerical rotation will be based on the last two(2) digits    You will be validated of the first five(5) numbers.

**\*ALL SALES ARE FINAL\***    **\*ALL SALES ARE FINAL\***    **\*ALL SALES ARE FINAL\***

VENDING

CREDITS_____ Limit$30/Whole dollars only) (STAMPS __.03__ ) (.05 __ ) (.23 __ ) (.37 __ Limit 60 ea) (1.00 __ )(TOTAL LIMIT ON STAMPS $ 22.20)
✔ PHOTO TICKETS _____ $1 EA.(Limit 10)    COPY CARDS __ $ 5.20 EACH ( LIMIT 2 )
\*\*NOTE:\*\*When it is your turn to shop, staff will call your name or number up to three times. If you do not show, you will forfeit your shopping privilege until the following week.\*\*

---

#### PRE-APPROVED ITEMS
____ SPO (HOBBY CRAFT ETC.)
____ SPI (SWEATS, RADIO, SHOES, ETC.)

#### SODAS ( 2 -12 PACK LIMIT TOTAL )
3.60___ DIET PEPSI 12PK# +
3.60___ PEPSI 12PK # +
3.60___ SUNKIST ORANGE 12PK # +
3.60___ SIERRA MIST 12PK # +
3.60___ DIET MOUNTAIN DEW  12PK # +
3.60___ MT. DEW 12PK# +
#### BEVERAGES ( 6 EACH LIMIT )
.40___ BOTTLED WATER (10 EA. LIMIT)
.90___ RUBY RED GRAPEFRUIT (6)16oz.
.90___ ORANGE JUICE (6) 16oz. bottle
#### ICE CREAM ( LIMIT 2 TOTAL )
1.65___ BEAR TRACKS
1.65___ BUTTER PECAN
1.65___ CHOCOLATE CHIP
1.65___ TOASTED ALMOND FUDGE
1.65___ VANILLA
1.65___ STRAWBERRY
1.65___ CHOCOLATE
1.15___ SHERBET
.60___ ICE CREAM SANDWICH(VANILLA)
.85___ SNICKERS ICE CREAM BAR
#### MISCELLANEOUS LIMITS MARKED W/( )
✔ 3.55___ WOOL GLOVES
✔ 2.35___ WOOL CAP

---

✔ 2.20___ AAA BATTERIES 4/PK (3)
2.20___ AA BATTERIES 4/PK (3)
2.10___ "C" BATTERIES 2/PK (4)

---

.75___ CORRECTION RIBBON
6.05___ TYPEWRITER RIBBON

---

✔ 2.35___ BIC SOFT PENS (12Pack)
✔ .10___ # 2 PENCIL (6)

---

#### MISCELLANEOUS CONTINUED
3.70___ RACQUETBALLS 2/PK (1)
14.00___ RACQUETBALL SPECS
3.60___ BASEBALL CAP (GRAY) (1)
3.30___ SAXOPHONE REEDS
2.20___ CLARINET REEDS
.25___ GUITAR PICKS (MED/THIN)
✔ 6.90___ CALCULATOR
✔ 1.70___ SEWING KIT (1)
✔ 8.45___ SCISSORS(1)
✔ 5.70___ PADLOCK (1)
✔ 10.35___ READER GLASSES ( W / M / S )
✔ 9.10___ GYM BAG

---

3.05___ SADDLE SOAP (1)
3.40___ SNEAKER WHITE POLISH
1.85___ BLACK SHOE POLISH
1.10___ WHITE SHOE LACES  54"
1.10___ WHITE SHOE LACES  72"
1.05___ BLACK BOOT LACES 54"
4.00___ SHOE SHINE BRUSH
✔ 1.95___ WHITE SOCKS (5 PAIR LIMIT)

---

#### \*\*\*\*\*FRUITS AND VEGETABLES\*\*\*\*\*\*
#### (COMBINATION OF 10 TOTAL)
WRITE IN  ITEM  AND  QUANTITY

✔ _tomato's_    _oranges_
_peppers_    _apples_
_onions_    _banana's_
_garlic_

---

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

#### MISCELLANEOUS CONTINUED
.95___ SHOWER SHOE    SIZE M-L(1)

---

#### SOAP  ( LIMIT 2 BARS TOTAL )
✔ .65___ SOAP DISH (1)
.60___ HERITAGE DEODORANT SOAP
.90___ DIAL (ANTI BACTERIAL)
1.60___ DOVE
1.05___ TONE
.80___ IRISH SPRING
.70___ IVORY
3.45___ NEUTROGENA  SOAP
2.40___ ARTRA COCOA BUTTER  SOAP
2.40___ ARTRA MEDICATED ACNE
3.30___ CLEARASIL BAR SOAP
1.20___ CLEAR SHOWER GEL
1.30___ LAUNDRY DETERGENT (2)
5.60___ TIDE ULTRA 2 BOX (2)
2.65___ BOUNCE DRYER SHEETS (2)
#### SHAMPOO  ( LIMIT 1 TOTAL )
1.70___ SUAVE BALSAM SHAMPOO
4.70___ PANTENE SHAMP. / COND.
✔ 2.80___ BABY SHAMPOO
5.70___ HEAD & SHOULDERS
3.60___ SULFUR 8
1.20___ CLEAR SHAMPOO / CONDITIONER
#### CONDITIONER ( LIMIT 1 TOTAL )
1.70___ SUAVE BALSAM CONDITIONER
5.35___ PANTENE PRO V
3.35___ SULFER 8
#### HEALTH ITEMS LIMITS MARKED  WITH ( )
4.60___ KAOPECTATE SYRUP 8OZ
7.50___ GAVISCON TABLETS
5.75___ DEBROX EAR DROPS
8.10___ DAIRY EASE
2.15___ ORAL JEL
1.75___ NASAL SPRAY (1)
✔ 5.05___ NAT.VEG.POWD.(METMUCIL)

*Exhibit G*

1.00___ PRE-COOKED RICE L/G # +
1.05___ SPAGHETTI PASTA (3)
1.70___ CHORIZO SAUSAGE
2.70___ HOT BEEF SUMMER SAUSAGE
1.00___ BEEF JERKY STICK
2.70___ BEEF SALAMI
1.30___ NACHO CHEESE RICE
1.65___ PINTO BEANS W/SPICES (REFRIED)
.60___ CHILI RICE #
.50___ SPANISH RICE W/ CHEESE #
1.95___ CASA GRANDE CHORIZO
1.30___ CORN TORTILLAS # +
.75___ FLOUR TORTILLAS  4/PAK #
1.00___ CASA GRANDE BEANS & RICE
1.70___ REFRIED BEANS (INSTANT)
3.30___ HONEY 12 OUNCE
2.20___ TRIPLEBERRY JAM

*G*

ALL SALES ARE FINAL AT THE WINDOW

T.C. OUTLAW, WARDEN

#### COOKIES, SNACKS, AND PASTRIES
.45___ MICRO POPCORN OLD FASHION
1.45___ FIG BARS-100 %
3.15___ GRANOLA BARS VARIETY +
1.25___ OATMEAL CREME COOKIES
.75___ CUPCAKES- CHOCOLATE CREME
.65___ HONEY BUNS
1.35___ DUNKIN STICKS
1.70___ BLUEBERRY TOASTER PASTRY
1.25___ PEANUT BUTTER BARS +
1.35___ SWISS ROLL
.65___ VANILLA CREME COOKIES +
.65___ LEMON CREME COOKIES +
.65___ PEANUT BUT. CREME COOKIES +
.65___ DUPLEX CREAM COOKIES +
4.05___ OREO COOKIES



**U.S. Department of Justice**

Office of Information and Privacy

_Telephone: (202) 514-3642_                    _Washington, D.C. 20530_

MAR 2 4 2004

Rec'd 3/29/04

Mr. Frederick W. Bauer
Register No. 02706-090
F.C.I., Unit D
P.O. Box 1731
Waseca, MN  56093

Dear Mr. Bauer:

This responds to your letter dated March 2, 2004, in which you are attempting to appeal from the action of the Federal Bureau of Prisons on your request for access to records.

A member of my staff has been advised by BOP personnel that it has no record of receiving a request from you. Accordingly, by copy of this letter, we are referring your letter to the BOP for processing and direct response to you. If you are dissatisfied with the BOP's action on your request, you may appeal again to the Office.

Sincerely,

Priscilla A. Jones
Administrative Specialist

PAJ:CIH

cc:    Federal Bureau of Prisons
       FOI/PA Unit
       Suite 738, HOLC Building
       Washington, DC 20530

_H_